<u>Patrick Long v. Injured Workers' Insurance Fund, et al.</u>, No. 90, September Term, 2015

**WORKERS' COMPENSATION – MD. CODE ANN., LABOR & EMPL. (1991, 2008 REPL. VOL.) §§ 9-602(a), 9-637(a) – CODE OF MARYLAND REGULATION 14.09.03.06 – AVERAGE WEEKLY WAGE – SOLE PROPRIETOR – NET PROFIT – GROSS RECEIPTS/GROSS INCOME –** Court of Appeals held that average weekly wage of sole proprietor who elects coverage under Maryland Workers' Compensation Act is to be calculated based on sole proprietorship's net profit, not on sole proprietorship's gross income or gross receipts. Sole proprietorship's net profit is best approximation of earnings that sole proprietor actually takes home because net profit does not include sole proprietorship's business costs and expenses.

Circuit Court for Montgomery County
Case No. 381364-V

Argued: May 10, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 90

September Term, 2015

_____

PATRICK LONG

v.

INJURED WORKERS' INSURANCE FUND,
ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T. (Retired,
Specially Assigned)
Battaglia, Lynne A. (Retired,
Specially Assigned)

JJ.

_____

Opinion by Watts, J.

_____

Filed: June 22, 2016

Under the Maryland Workers' Compensation Act ("the Act"), Md. Code Ann., Lab. & Empl. (1991, 2008 Repl. Vol.) ("LE") §§ 9-101 to 9-1201, a "covered employee" is entitled to compensation from his or her employer for an accidental personal injury. See LE § 9-501(a)(1) ("Except as otherwise provided, each employer of a covered employee shall provide compensation in accordance with this title to[] the covered employee for an accidental personal injury sustained by the covered employee[.]" (Paragraph break omitted)). Pursuant to LE § 9-227(b), for purposes of workers' compensation, "[a] sole proprietor may elect to be a covered employee if the proprietor devotes full time to the business of the proprietorship." In other words, under certain circumstances, a sole proprietor may elect to be a "covered employee" for purposes of workers' compensation. Under the Act, the amount of compensation that is due to a "covered employee" who "has a permanent total disability resulting from an accidental personal injury" is based on the covered employee's "average weekly wage" ("AWW"). LE § 9-637(a)(1). Specifically, the amount of compensation that is due to the covered employee in such a circumstance is two-thirds of the covered employee's AWW, provided that the AWW does not exceed the State's AWW or equal less than $25. See LE § 9-637(a)(1).

This case involves a matter of first impression in Maryland—namely, how to calculate the AWW of a sole proprietor who has elected coverage under the Act. Specifically, we must decide whether the AWW of a sole proprietor who elects coverage under the Act should be calculated based on the sole proprietorship's gross receipts or gross

income (without deducting business expenses)[1] or net profit (the gross receipts less business expenses). We hold that the AWW of a sole proprietor who elects coverage under the Act is to be calculated based on the sole proprietorship's net profit, not on the sole proprietorship's gross receipts or gross income. The sole proprietorship's net profit is the best approximation of the earnings that a sole proprietor actually takes home because net profit does not include the sole proprietorship's business costs and expenses.

## BACKGROUND

Patrick Long ("Long"), Petitioner, is the self-employed sole proprietor and owner of Long's Floor Works ("the Employer"). Before 2011, Long elected to obtain workers' compensation coverage as a covered employee. In 2011, Long was working as a subcontractor for Ryan Floors, Incorporated. Ryan Floors, Incorporated paid the Employer based on the number of hours that Long worked. In July 2011, Long injured his back while installing carpet during the course of his employment. Long's injury required surgery, and, according to Long's counsel, Long is likely "going to be disabled for life."

Almost six months later, on January 23, 2012, Long filed with the Workers' Compensation Commission ("the Commission") a "Notice of Employee's Claim," seeking workers' compensation benefits. On July 16, 2012, the Commission conducted a hearing on Long's claim. On July 19, 2012, the Commission issued an "Award of Compensation," finding that: (1) Long "sustained an accidental injury arising out of and in the course of his employment"; (2) Long's disability was the result of the work-related accidental injury; (3)

---

[1] In this opinion, we use the terms "gross income" and "gross receipts" interchangeably.

Long was temporarily totally disabled from August 20, 2011 to September 20, 2011, and from November 1, 2011 "to the present and continuing"; (4) Long was temporarily partially disabled from September 21, 2011 to October 31, 2011; (5) the authorization for medical treatment as recommended by Long's doctor was allowed; (6) the insurer, the Injured Workers' Insurance Fund ("IWIF"), Respondent,[2] and the Employer would pay causally-related medical expenses as stipulated by the Commission's Medical Fee Guide; and (7) Long's AWW was $1,500, "subject to verification." Accordingly, based on its findings, the Commission ordered that IWIF and the Employer compensate Long for temporary total disability for his past and continuing temporary total disability at a rate of $940 per week, and that IWIF and the Employer pay the causally-related medical expenses. The Commission also ordered IWIF and the Employer to compensate Long for his temporary partial disability at a rate of 50% of the difference between Long's AWW "and his wage[-]earning capacity in the same employment or otherwise if less than before the accident, but not to exceed fifty per centum of the State [AWW] for the period" September 21, 2011 to October 31, 2011.

On July 28, 2012, Long filed with the Commission a "Request for Document

---

[2]At the time, IWIF provided workers' compensation insurance. Effective October 1, 2013, IWIF was converted to "Chesapeake Employers' Insurance Company," "a nonprofit, non-stock, private corporation[.]" "Conversion of IWIF to Chesapeake Employers' Insurance Company," Chesapeake Employers' Insurance, http://www.ceiwc.com/about-chesapeake/company-overview/Conversion%20index.html [https://perma.cc/5N85-7U49]. See also 2012 Md. Laws 3750 (Vol. V, Ch. 570, S.B. 745) ("FOR the purpose of converting [IWIF] into a statutorily created, private, nonprofit, and nonstock workers' compensation insurer to be named the Chesapeake Employers' Insurance Company[.]"). In this opinion, however, we refer to the insurer as "IWIF."

Correction," asking that two "errors" in the Commission's Award of Compensation be corrected. Specifically, Long asked that the Commission amend the date of the accidental injury from July 24, 2011 to July 31, 2011, as he had "amended the date of the accident at the hearing[.]" Long also stated that the Commission's calculation of his AWW was incorrect, and asked that the Commission amend the AWW from $1,500 to $1,737.11 in accordance with a "Wage Statement" that he attached to the Request for Document Correction. The attached Wage Statement demonstrated that Long had calculated his AWW to be $1,737.11 by adding his "gross wages" from the fourteen weeks preceding the injury, and dividing the total by fourteen. Long also attached a statement from Ryan Floors, Incorporated showing the Employer's gross receipts throughout 2011.

On August 7, 2012, the Commission issued an amended Award of Compensation, amending in its findings the date of the accidental injury from July 24, 2011 to July 31, 2011, and changing Long's AWW from $1,500 to $1,737.11. The Commission made no changes to any other aspects of the Award of Compensation. In other words, IWIF and the Employer were still required to compensate Long for temporary total disability at the rate of $940 per week and to compensate Long for temporary partial disability at a rate of 50% of the difference between Long's AWW "and his wage[-]earning capacity in the same employment or otherwise if less than before the accident, but not to exceed fifty per centum of the State [AWW] for the period" September 21, 2011 to October 31, 2011.

On August 16, 2012, IWIF filed with the Commission a motion for rehearing on the AWW amount, stating that Long's AWW should be $225.90, not $1,737.11. Almost one year later, on August 12, 2013, the Commission conducted a rehearing on the amount of

Long's AWW. During the rehearing, IWIF alleged that Long's "gross wages" in 2011 were between $11,000 and $12,000. IWIF based its figures on Schedule C of Long's 2010 federal income tax return,[3] which showed a net profit of $11,747, and IWIF's premium audit report for the Employer from May 2010 through May 2011, which showed Long's "gross wages" as $11,077.[4] IWIF argued that Long's AWW should be based on the Employer's net profit, which is the money that Long received after subtracting his business expenses from his gross receipts. IWIF's counsel noted that dividing the net profit of $11,747 by fifty-two, the number of weeks in a year, would yield an AWW of $225.90. Long responded that a calculation of his AWW had to be based on the Employer's gross receipts, not net profit, because gross receipts are the equivalent of gross wages for a sole proprietor. Indeed, Long argued that nothing under Maryland law supported calculating a sole proprietor's AWW based on net profit. Long further asserted that IWIF based its insurance premiums on the Employer's gross receipts, not on the Employer's net profit. IWIF replied that a self-employed individual's net profit essentially constitutes wages, as the net profit is the amount that the individual takes home after business expenses.

During the rehearing, various documents were submitted to the Commission. Schedule C of Long's 2010 federal income tax return showed the Employer's gross receipts as $38,748 and the Employer's net profit as $11,747. Long's 2011 federal individual income tax return (Form 1040), including Schedule C and Schedule SE (Self-Employment

[3]Schedule C of the Internal Revenue Service's Form 1040 shows a sole proprietorship's "Profit or Loss From Business."

[4]According to IWIF, during the premium audit, Long indicated that his gross wages were $11,747, as he had reported in Schedule C.

Tax), were also submitted. Long's 2011 federal individual income tax return stated that he received no wages. Line 12 of Long's 2011 federal individual income tax return, however, listed his business income as $16,879, the figure that was identified in Schedule C and Schedule SE as the Employer's net profit.[5] Also in Schedule C of Long's 2011 federal income tax return, the Employer's gross receipts are shown as $44,606, and the total business expenses are shown as $27,727. Thus, the Employer's net profit was $16,879, which is the gross receipts of $44,606 less the business expenses of $27,727.[6]

Also submitted was correspondence from IWIF to Long concerning the Employer's insurance premiums. For the policy that was effective from May 15, 2008 through May 15, 2009, one document showed an estimated premium of $2,196 based on an audited payroll of $36,900. Additionally, in response to a Premium Audit Report for the policy that was effective from May 15, 2010 through May 15, 2011, in a pre-printed form dated May 23, 2011—only two months before the accidental injury—Long stated that there was zero employee payroll and that his "gross wages" were $11,077.[7] Another document from IWIF dated March 16, 2012 showed that the premium for May 15, 2011 through May 15, 2012 was $2,416, and that the estimated renewal premium for May 15, 2012 through May 15, 2013 was $2,905, subject to an audit. And, in a letter dated May 15, 2012, as to the

[5]In Schedule SE, the Employer's net profit was used to calculate Long's self-employment tax liability.

[6]The business expenses were for the following items: car and truck expenses of $12,346; depreciation of $1,731; insurance of $2,444; office expenses of $3,614; rent or lease of vehicles, machinery, and equipment of $263; supplies of $4,889; deductible meals and entertainment of $1,042; and other expenses of $1,398.

[7]Although not stated on the form, it appears that Long calculated his gross wages based on the Employer's net profit between May 15, 2010 and May 15, 2011.

policy that was effective from May 15, 2011 through May 15, 2012, IWIF stated that the premium for the "policy was based on your estimated payroll" and that "[t]he information provided on this Premium Audit Report will determine the proper premium based on the actual payroll."

On August 13, 2013, the Commission issued an order finding that Long's AWW was $496.44. The Commission explained its reasoning as follows:

> [Long] submitted his 2011 [federal individual] tax return. This document is the best evidence of the correct [AWW].

> [Long] earned a total of $16,879.00 in 2011. Previous Orders of the Commission reveal that [Long] only worked from 1/1/11 to 8/19/11 and was out of work for the remainder of the year[,] with the exception of a brief period when he worked part-time from 9/21/11 to 10/31/11.

> The period from 1/1/11 to 8/19/11 is 34 weeks.

> Thus, the correct [AWW] is $496.44[,] which was calculated by taking the full earnings for the year ($16,879.00) and dividing that figure by 34 weeks. The Commission recognizes that this number is slightly higher than the actual [AWW] because[,] to be precisely accurate[,] the amount earned while working from 9/21/11 to 10/31/11 should be deducted from the 2011 earnings before dividing by 34, but the Commission does not have that post-injury wage information available.

On August 23, 2013, Long filed with the Commission a Request for Rehearing and a Motion for Rehearing as to the Commission's finding that his AWW was $496.44. In the motion, Long contended that the Commission erred in calculating his AWW based on his net profit because IWIF allegedly charged him an insurance premium "based upon his gross revenues or gross earnings and not his net profit[]." (Underlining omitted). In other words, Long argued that his AWW should be calculated based on his gross receipts because that is the figure that IWIF supposedly used to determine his insurance premiums.

According to Long, if IWIF could calculate his AWW based on his net profit, IWIF would receive a "windfall profit" because IWIF "would be allowed to have collected premiums that bore no risk of loss." On September 4, 2013, the Commission denied the Request for Rehearing.

On September 12, 2013, Long filed a petition for judicial review in the Circuit Court for Montgomery County ("the circuit court"). On October 2, 2013, IWIF filed a response to the petition for judicial review. Thereafter, the parties filed cross-motions for summary judgment. Long attached to his motion for summary judgment a signed affidavit, in which he averred that an IWIF representative had told him that his insurance premium for the policy year beginning on May 15, 2012 "would be based upon [his] gross profit[] of $48,000.00."[8]

On February 12, 2014, the circuit court conducted a hearing on the cross-motions for summary judgment. During the hearing, Long's counsel contended that Long's AWW should be calculated based on the Employer's gross income in the weeks preceding the accidental injury because that "is how normal employees' [AWW]s are computed." Long's counsel argued, alternatively, that Long's AWW should be calculated based on the Employer's gross income because, before the accidental injury, IWIF allegedly based insurance premiums on the Employer's gross receipts. At the conclusion of the hearing,

---

[8]Curiously, Long did not explain in the affidavit or elsewhere why he needed workers' compensation insurance for the policy year beginning on May 15, 2012, where he had presented evidence that he had not worked since October 31, 2011, and where Long's counsel subsequently advised the circuit court that Long was not expected to work again.

the circuit court orally granted IWIF's motion for summary judgment, thereby affirming the Commission's decision, and denied Long's motion for summary judgment. On the same day, the circuit court issued orders to the same effect.[9]

On February 28, 2014, Long filed a notice of appeal. In a reported opinion dated September 30, 2015, the Court of Special Appeals affirmed the circuit court's judgment granting IWIF's motion for summary judgment and affirming the Commission's decision. See Long v. Injured Workers' Ins. Fund, 225 Md. App. 48, 72, 123 A.3d 562, 577 (2015). Specifically, the Court of Special Appeals held that a sole proprietor's "gross wages" and "gross income" are not synonymous, and that, under the circumstances of the case, "the Commission did not err in concluding that AWW should be based on Long's net profit[.]" Id. at 57, 66, 123 A.3d at 568, 573. The Court of Special Appeals reasoned: "To disregard [Long]'s business expenses in calculating the AWW of a sole proprietor would lead to an unjustifiably inflated AWW figure—a figure far higher than the economic advantage Long gained by working." Id. at 66, 123 A.3d at 573 (citation omitted). The Court of Special Appeals further rejected Long's alternative argument that, if insurance premiums are based on a sole proprietorship's gross income, then AWW must also be calculated on that basis. See id. at 66-67, 72, 123 A.3d 573, 576-77. As to that argument, the Court of Special Appeals stated: "Adoption of such a rule in a case like the one at bar would result in a sole

_____

[9]Because Long is a sole proprietor and elected to obtain workers' compensation coverage as a covered employee of the Employer, throughout the proceedings before the Commission and the circuit court, the Employer was represented separately by counsel who was working with IWIF. The Employer's counsel attended the August 12, 2013, rehearing before the Commission, but did not attend the February 12, 2014, hearing before the circuit court.

proprietor being able to recover an AWW far greater than the amount of money he or she was out-of-pocket as a result of not being able to work." Id. at 72, 123 A.3d at 577.

Long thereafter filed a petition for a writ of *certiorari*, which this Court granted on January 27, 2016. See Long v. Injured Workers' Ins. Fund, 446 Md. 218, 130 A.3d 507 (2016).

## DISCUSSION

### The Parties' Contentions

Long contends that the Commission incorrectly calculated his AWW because Maryland law requires that the AWW be based on his gross wages, or gross income, that were earned in the fourteen weeks preceding the accident. Long argues that Code of Maryland Regulation ("COMAR") 14.09.03.06 unambiguously requires that the AWW be calculated using gross wages, without regard to whether an individual is a regular employee who works for a separate employer or a self-employed sole proprietor. Long asserts that case law establishes a relationship between the premiums that are charged by a workers' compensation insurer and the benefits that are paid to an injured insured, and that, as a result of that relationship, the AWW is to be based on the amount that is utilized by an insurer to calculate premiums. According to Long, the Commission disregarded this relationship when it calculated his AWW based on net profit instead of "gross receipts/payroll." In other words, Long maintains that the AWW must be calculated on the same basis as insurance premiums are calculated—here, gross payroll.

Long further contends that, to the extent that the term "gross wages" in the context of a sole proprietor is ambiguous, such ambiguity must be construed in his favor to mean

- 10 -

"gross payroll." Long argues that he will not receive a windfall if his AWW is calculated based on his gross receipts because he paid insurance premiums based on his gross payroll. Long asserts that cases from other jurisdictions are largely distinguishable from this case, and maintains that certain other jurisdictions have rejected the use of net profit to calculate the AWW. Alternatively, Long contends that this Court should remand the case to the Commission for a hearing to determine a different computation method for AWW, "such as what figure [] Long would have to pay a general manager to do the work he did[.]"

IWIF[10] responds that the Commission was correct in calculating Long's AWW by dividing the Employer's net profit—not gross receipts—by the number of weeks that Long had worked in the year that he was injured. IWIF contends that the Commission is permitted to deviate from the AWW calculation method set forth under the Act and in COMAR 14.09.03.06, and argues that the Commission was correct in deviating in this case because, as a sole proprietor, Long did not receive wages from the Employer. IWIF asserts that other jurisdictions have taken the position that the best method of calculating a sole proprietor's AWW is through using net profit or net taxable income.

IWIF maintains that an employer's gross receipts are not analogous to an employee's gross wages because gross receipts include business expenses and do not reflect the money that is actually available to the sole proprietor. According to IWIF, Long's 2011 federal individual tax return—specifically Schedule C and the Employer's net profit—provides the best evidence from which to calculate Long's AWW. IWIF contends

---

[10]The Employer, although a named Respondent, has not filed a brief in this Court and did not participate in oral argument before this Court.

that, unlike gross receipts, net profit represents the money that the sole proprietor earned

and that is available to the sole proprietor after business expenses are taken into account.

As to a relationship between the AWW and insurance premiums, IWIF contends that no

Maryland court has held that insurance premiums dictate AWW and argues that using

insurance premium estimates to calculate the AWW would be speculative. As a final

matter, IWIF asserts that using the Employer's gross receipts to calculate Long's AWW

would result in a "windfall benefit" that is far beyond what Long actually earns.

**Standard of Review**

In Hranicka v. Chesapeake Surgical, Ltd., 443 Md. 289, 297-98, 116 A.3d 507, 512

(2015), we set forth the applicable standard of review, stating:

> Generally, in an appeal from judicial review of an agency action, we review the agency's decision directly, not the decision of the circuit court or the Court of Special Appeals. We must respect the expertise of the agency and accord deference to its interpretation of a statute that it administers; however, we may always determine whether the administrative agency made an error of law. The Commission's decision "is presumed to be prima facie correct[.]" LE § 9-745(b)(1). That presumption, however, does not extend to questions of law, which we review independently. We do, though, afford the Commission a degree of deference, as appropriate, in its formal interpretations of the Workers' Compensation Act.

> We have explained that an agency's interpretation of a regulation is a conclusion of law, and that a great deal of deference is owed to an administrative agency's interpretation of its own regulation. Nevertheless, despite the deference, it is always within our prerogative to determine whether an agency's conclusions of law are correct. Accordingly, we determine whether the agency's conclusions are plainly erroneous or inconsistent with the regulation. When we construe an agency's rule or regulation, the principles governing our interpretation of a statute apply. Thus, we look to the regulation's plain language as the best evidence of its own meaning, and when the language is clear and unambiguous, our inquiry ordinarily ends there.

(Some brackets, citations, and internal quotation marks omitted). Moreover, we have stated that, in cases involving the Act, "we also endeavor to interpret its provisions liberally, where possible, in order to effectuate the broad remedial purpose of the statutory scheme." W.M. Schlosser Co. v. Uninsured Emp'rs Fund, 414 Md. 195, 204, 994 A.2d 956, 961 (citation omitted).

As to the method for calculating a covered employee's AWW, we have stated that the issue essentially is a question of law. See Gross v. Sessinghause & Ostergaard, Inc., 331 Md. 37, 48, 626 A.2d 55, 61 (1993) ("Where the [AWW] issue in a workers' compensation case has not depended upon a resolution of disputed facts, but instead has concerned the method for determining the injured worker's [AWW], this Court has held that the question is one of law." (Citations, emphasis, footnote, and internal quotation marks omitted)).

**Calculation of the AWW in Maryland**

Under the Act, LE § 9-637(a), concerning payment of compensation, provides:

(a) *Amount of payment.* — (1) Except as provided in paragraph (2) of this subsection, if a covered employee has a permanent total disability resulting from an accidental personal injury or an occupational disease, the employer or its insurer shall pay the covered employee compensation that equals two-thirds of the [AWW] of the covered employee, but may not:

    (i) exceed the State [AWW]; or

    (ii) be less than $25.

(2) If the [AWW] of the covered employee is less than $25 at the time of the accidental personal injury or last injurious exposure to the hazards of the occupational disease, the employer or its insurer shall pay the covered

employee weekly compensation that equals the [AWW] of the covered employee.

(3) Payments under paragraph (1) or (2) of this subsection may not exceed a total of $45,000.[11]

LE § 9-602(a), in turn, describes the general computation of a covered employee's AWW, providing:

(1) Except as otherwise provided in this section, the [AWW] of a covered employee shall be computed by determining the average of the weekly wages of the covered employee:

(i) when the covered employee is working full time; and

(ii) at the time of:

1. the accidental personal injury; or

2. the last injurious exposure of the covered employee to the hazards of an occupational disease.

(2) For purposes of a computation under paragraph (1) of this subsection, wages shall include:

(i) tips; and

(ii) the reasonable value of housing, lodging, meals, rent, and other similar advantages that the covered employee received from the employer.

(3) If a covered employee establishes that, because of the age and experience of the covered employee at the time of the accidental personal injury or last injurious exposure to the hazards of the occupational disease, the wages of the covered employee could be expected to increase under normal circumstances, the expected increase may be taken into account when computing the [AWW] of the covered employee under paragraph (1) of this subsection.

---

[11]LE § 9-637(b) provides, however, that, "[n]otwithstanding the $45,000 limitation in subsection (a)(3) of this section, the employer or its insurer shall pay the benefit for the period that the covered employee is permanently totally disabled."

Usually, a covered employee's AWW is calculated by adding gross wages that the employee earned in the fourteen weeks preceding the accidental personal injury and dividing the sum by fourteen. Indeed, COMAR 14.09.03.06[12] provides, in pertinent part:

A. Preliminary Determination. For the purpose of making an initial award of compensation before a hearing in the matter, the Commission shall determine the claimant's [AWW] from gross wages, including overtime, reported by the claimant on the employee's claim form.

B. Filing of Wage Statement. As soon as practicable, the employer/insurer shall file a wage statement containing the following information:

(1) The average wage earned by the claimant during the 14 weeks before the accident, excluding the time between the end of the last pay period and the date of injury, provided that periods of involuntary layoff or involuntary authorized absences are not included in the 14 weeks;

(2) Those weeks the claimant actually worked during the 14 weeks before the accident;

(3) Vacation wages paid; and

(4) Those items set forth in [LE] § 9-602(a)(2)[.]

C. Determination at First Hearing.

(1) Calculation of the [AWW] shall be adjudicated and determined at the first hearing before the Commission.

(2) All parties shall be prepared to produce evidence from which the Commission can determine an accurate [AWW] at the first hearing.

(3) If the Commission determines that an inaccurate [AWW] resulted in the overpayment or underpayment of benefits, the Commission may order:

---

[12]Pursuant to LE § 9-309(a), "[t]he Commission may adopt regulations to carry out this title[,]" *i.e.*, to carry out the Act. COMAR 14.09.03.06 is one such regulation adopted by the Commission.

(a) A credit against future permanent disability benefits;

(b) The payment of additional compensation; or

(c) Any other relief the Commission determines is appropriate under the circumstances.

This Court has held, however, that, under certain circumstances, the Commission has discretion to use a period that is longer or shorter than the period that COMAR 14.09.03.06 sets forth to determine the AWW. For example, in Gross, 331 Md. at 39, 626 A.2d at 56, this Court considered the time period that the Commission could use in determining a covered employee's AWW. At issue in that case was COMAR 14.09.03.06's predecessor, COMAR 14.09.01.05, which provided that, "unless otherwise ordered after the hearing, compensation payments shall be based on: [] the [AWW] earned by the employee during the 13 weeks before the accident[.]" Gross, 331 Md. at 40, 626 A.2d at 57. In considering whether the Commission could depart from the thirteen-week period after a hearing, we noted that, "prior to the promulgation of a regulation specifying a time period for calculating a[n] injured worker's [AWW], the Commission was free to choose an appropriate period on a case-by-case basis." Id. at 50, 626 A.2d at 62. Indeed, several of this Court's cases "recognized that an injured worker's [AWW] can be based on a one[-]year period." Id. at 50, 626 A.2d at 62 (citations omitted). Ultimately, we held that the Commission could depart from the time period set forth in COMAR, explaining:

> [COMAR 14.09.01.05] appears to be designed to address the vast majority of cases in which there is no hearing. In such cases, it provides a definite rule in lieu of a case-by-case basis. The regulation also supplies a standard in those cases in which there is a hearing but where no question arises concerning the appropriate time period or where the Commission decides that it should not depart from the thirteen-week rule. Nevertheless,

contrary to the view of the courts below, in a case where there is a hearing, the regulation does not purport to restrict the Commission in any manner from utilizing a different time period if the Commission deems it appropriate to do so.

Gross, 331 Md. at 50, 626 A.2d at 62 (footnote omitted).

Thus, generally speaking, a covered employee's AWW is calculated based on LE § 9-602(a) and COMAR 14.09.03.06. And, once the AWW is calculated, LE § 9-637(a)(1) instructs the employer or the insurer to "pay the covered employee compensation that equals two-thirds of the [AWW] of the covered employee[.]" For the ordinary employee, the operation of these provisions poses no issue. A sole proprietor, however, is self-employed and not an "employee" in the traditional sense. Indeed, pursuant to LE § 9-227(a), "a sole proprietor is not a covered employee" unless he or she makes an election in accordance with LE § 9-227(b) and submits written notice of that election to the Commission and the insurer in accordance with LE § 9-227(c).[13] And, as the Supreme Court of Arizona has recognized:

> In reality, sole proprietors are not employees and do not earn wages. A sole proprietor can never be an employee of the business he or she creates because a sole proprietor and the business are one legal entity. A person cannot be one's own employee. Nor does a sole proprietor receive a "wage" from the business for his or her services. Thus, using employee language in a nonemployee setting creates definitional problems.

Mail Boxes v. Indus. Comm'n of Ariz., 888 P.2d 777, 779 (Ariz. 1995).

Significantly, in Maryland, the Act does not address how to calculate the AWW of

---

[13]In Watson v. Twin City Fire Ins. Co., 143 Md. App. 637, 643, 795 A.2d 771, 774-75 (2002), the Court of Special Appeals explained: "Ordinarily, a sole proprietor cannot receive benefits under the Act, but the [General Assembly] specifically created an exception to that rule with its enactment of [LE] § 9-227."

- 17 -

a sole proprietor who has elected to be a "covered employee." And neither this Court nor the Court of Special Appeals (until this case) has addressed the matter. Thus, we examine relevant case law from Maryland and other jurisdictions to determine the best calculation method for determining a sole proprietor's AWW.

**Relevant Maryland Case Law**

This Court has commented on the correlation between the basis of workers' compensation insurance premiums and actual wages that are paid to the employee. In Picanardi v. Emerson Hotel Co., 135 Md. 92, 93-96, 108 A. 483, 483-84 (1919), this Court held that an employee's AWW did not include the monetary value for the employee's board where the monetary value of the employee's board had not been established at the time that the employee was hired, and this Court held that the AWW could not be calculated on a basis that was broader than that for calculating insurance premiums. The employee worked as a baker for the Emerson Hotel Company, and injured his hand during the course of his employment. See id. at 92, 108 A. at 483. The employee was paid $50 per month and board, but there was no agreement between the employee and the Emerson Hotel Company at the time that he was hired as to the monetary value of the board. See id. at 92-93, 108 A. at 483. After the injury, the employee applied for workers' compensation, and the Commission ordered compensation that was based on the employee's monthly wages. See id. at 93, 108 A. at 483. The employee appealed, contending that he should have been permitted to prove the monetary value of the board and to have that included as part of his AWW. See id. at 93, 108 A. at 483.

This Court considered whether the employee was entitled under the Act "to have

the money value of board included as part of his weekly wages in computing the amount of compensation to which he may be entitled, where the money value of the board had not been fixed between his employer and himself at the time of the hiring[.]" Id. at 93-94, 108 A. at 483-84. We answered that question in the negative, and observed that, because the monetary value of the board was not fixed when the employment started, the value of the board would not have been used in determining what the Emerson Hotel Company paid in workers' compensation insurance premiums. See id. at 94-95, 108 A. at 484. Specifically, at the time, the Act provided that the State Accident Fund and private insurers needed to base insurance premiums on the employers' "payrolls." Id. at 94, 108 A. at 484. "Payroll," however, was synonymous with "wages," and "wages" meant "money or other things which ha[d] been given a fixed money value at the outset[.]" Id. at 95, 108 A. at 484. Indeed, we stated: "The State Accident Fund is created by premiums equal to fixed percentages of the money paid under employers' pay[]rolls. Provision is made for the facilitation of calculation on the basis on these payrolls." Id. at 94, 108 A. at 484 (citations omitted).

Because insurers could not have charged premiums for board where the monetary value of the board was not fixed at the time of hiring and was not part of the payroll, this Court concluded that the compensation to the employee could not have been based on an AWW that included the value of board, explaining: "It is clear [that] the [General Assembly] did not intend, as to insurance in the State Accident Fund, that board was to be included as wages, unless its money value was fixed by the parties at the time of the hiring." Id. at 96, 108 A. at 484. Furthermore, we concluded that "it would be unreasonable to hold

- 19 -

that it was intended that the premiums and rates of insurance from which the fund to pay losses were derived were to be calculated on a narrower basis than that adopted for the allowance of compensation." Id. at 96, 108 A. at 484.

In Stevenson v. Hill, 171 Md. 572, 575, 189 A. 910, 912 (1937), this Court held that a part-time employee's AWW was to be calculated based on the average of the amount that the employee might have earned working all the time that the coal mines in the region generally were operated over a period immediately preceding the injury. The employee was a coal inspector who sustained an injury while at work that caused his death. See id. at 573, 189 A. at 911. Because of the Great Depression, the mine at which the employee had been employed was not operational year-round, and the employee had not been employed full-time. See id. at 574, 189 A. at 911. At the time, the Act provided that compensation was to be based on the employee's AWW that was "earned by an employee when working on full time." Id. at 573, 189 A. at 911. The Commission ordered compensation based on the employee's AWW, which it calculated based on the wages that the employee earned during the six months preceding his death. See id. at 573, 189 A. at 911. The employee's widow applied to reopen the case, and the Commission adjusted the employee's AWW based on the wages that the employee earned in the year preceding his death; the adjustment of the AWW, however, did not increase the compensation to be paid. See id. at 573, 189 A. at 911. The employee's widow appealed, contending that the employee's AWW should be based on what he "would have [] earned if the mines had been working to capacity, or to the limit of daily and weekly working time in the region, eight hours a day for six days a week[.]" Id. at 575, 189 A. at 912.

This Court rejected the employee's widow's calculation method for the AWW, and held that, in accordance with prior case law, the AWW was "to be determined by an average of the amount the employee might have earned working all the time the mines in the region generally were employed over a period immediately preceding the injury[.]"  Id. at 575, 189 A. at 912.  Relying in part on Picanardi, this Court explained:

> The [workers' compensation] system has as its foundation a correspondence between compensation to be paid and the amounts paid the active workmen according to the pay rolls.  The actual earnings are to furnish the basis of calculating the fund to cover the compensation, which is built up by insurance with an insurance carrier, the State Accident Fund, or by self-insurance.  The premiums paid or set aside to constitute the fund are thus ascertained.  The actual earnings are taken as determining the risk in loss of earnings or capacity.  This correspondence would have to be disregarded to accept the present claimant's contention.  The insurance premiums and the fund built up for compensation would lose their relation to the compensation to be paid.  Employers distributing work on the share-the-work plan would multiply the responsibility for compensation without any increase in work done.  Part-time work for the benefit of employees during a time of depression could be provided only under a like disproportionate burden of compensation.  Conceivably work[ers who are] injured might be entitled to receive much more by reason of their injuries than they could possibly earn at work.

Id. at 576-77, 189 A. at 912-13 (citations omitted).

In Crowner v. Balt. United Butchers Ass'n, 226 Md. 606, 607-08, 612-13, 175 A.2d 7, 7-8, 10 (1961), this Court held that the AWW of an employee, who was injured while working at a once-a-month weekend job, was to be calculated based only on the wages that the employee earned at the once-a-month weekend job, and not based on those wages plus the employee's regular full-time wages.  The employee worked full-time for Armour and Company ("Armour"), earning $90.80 weekly; the employee also worked one Saturday per month for Baltimore United Butchers Association ("Baltimore United"), earning $15 for

- 21 -

each Saturday that he worked.  See id. at 607-08, 175 A.2d at 7-8.  The employee was injured while working for Baltimore United.  See id. at 608, 175 A.2d at 8.  The employee submitted a workers' compensation claim, and the Commission awarded him compensation based on an AWW of $3.46, which was the AWW of the Baltimore United job only.  See id. at 608, 175 A.2d at 8.  The employee contended that his AWW should have taken into account his earnings from both Armour and Baltimore United.  See id. at 608, 175 A.2d at 8.

This Court affirmed the Commission's decision that the employee's AWW should have been calculated based on what he earned from Baltimore United only, explaining:

> In the instant case the [employee] entered into a contract of hire with the employer, the terms of which were specific as to all factors.  The employer insured the [employee]'s employment in accordance with the provisions of the [Workers'] Compensation law.  By reason of the contract of hire the employer incurred certain obligations under the Compensation law.  To impose other additional obligations on the employer and insurer, both of whom were, at the time of the accident, complying fully with all of their obligations under both the statutes and their contracts, would be unfair and, by judicial construction, extend the coverage of the compensation law into an area which would lead to disruption and confusion.  If the law should be broadened to include the [employee]'s claim it should be modified by the [General Assembly], and not by our decision in this case.

Id. at 612-13, 175 A.2d at 10.

More recently, in Uninsured Emp'rs Fund v. Pennel, 133 Md. App. 279, 285-86, 754 A.2d 1120, 1123 (2000), the Court of Special Appeals held that breakfasts that an employer prepared for a farm worker constituted "payroll" under the Act such that the farm worker was a covered employee.  In its analysis, the Court looked to LE § 9-602(a) and how a covered employee's AWW is calculated, and pointed out that, in Crowner and

<u>Picanardi</u>, this Court had "recognized the nexus between the terms 'payroll' and '[AWW]' as they are used in the Act." <u>Pennel</u>, 133 Md. App. at 293-94, 754 A.2d at 1127-28. The Court explained that the employer made breakfast for the farm worker six days per week for twelve years, and that the meals constituted compensation to the farm worker for his labor and thus should have been included in the computation of his wages. <u>See id.</u> at 295, 754 A.2d at 1128. And, the Court stated that, "[g]iven the relationship between the terms 'wages' and 'payroll,' [the Court] further conclude[d] that the meals were part of the payroll in th[e] case." <u>Id.</u> at 295, 754 A.2d at 1128.

The Court then addressed our holding in <u>Picanardi</u>, 135 Md. at 96, 108 A. at 484— that "[i]t is clear the [General Assembly] did not intend, as to insurance in the State Accident Fund, that board was to be included as wages unless its money value was fixed by the parties at the time of the hearing"—and noted that "nothing in the record suggest[ed] that the monetary value of the meals was fixed by the parties when [the farm worker] was hired." <u>Pennel</u>, 133 Md. App. at 295, 754 A.2d at 1128-29. Nonetheless, the Court held that, because of amendments to the Act as well as subsequent case law, "fixing the value of meals at the time of hiring is no longer a prerequisite to recovering the reasonable value of meals under the circumstances presented in this case." <u>Id.</u> at 295, 754 A.2d at 1129. Indeed, the Court noted that at the time that <u>Picanardi</u> was decided, the Act provided that payroll included, among other things, "wages . . . whether payable in money, board or otherwise[, p]rovided the money value of board and similar advantages shall have been fixed by parties at the time of hiring." <u>Pennel</u>, 133 Md. App. at 295-96, 754 A.2d at 1129 (quoting <u>Picanardi</u>, 135 Md. at 95-96, 108 A. at 484). However, the Court explained that,

- 23 -

after Picanardi, the Act was amended to no longer make "reference to any requirement that the value of board (meals) and similar advantages be fixed at the time of hiring" and recent case law held that "such details may be unnecessary, as the value of meals, rent, lodging and similar advantages, consideration of which is necessary in the computation of wages under the Act, are easily converted into monetary figures with a present cash value." Pennel, 133 Md. App. at 296, 754 A.2d at 1129. In other words, in Pennel, the Court implicitly recognized that the reasoning that underlay this Court's decision in Picanardi has been superseded by both statute and case law; *i.e.*, our reasoning in Picanardi is based on statutory language that no longer exists.

In any event, significantly, none of these cases—Picanardi, Stevenson, Crowner, or Pennel—involved a self-employed sole proprietor's AWW, and the method by which a sole proprietor's AWW should be calculated. Thus, we look to other jurisdictions that have considered calculation of a self-employed individual's AWW for guidance.

## Case Law from Other Jurisdictions

Courts in other jurisdictions are split regarding whether gross receipts, net profit, or some other figure is the best method by which to calculate a sole proprietor's AWW. In Little Suwannee Lumber Co. v. Fitzgerald, 322 S.E.2d 347, 348-49 (Ga. Ct. App. 1984), the Court of Appeals of Georgia held that an independent contractor's AWW was properly calculated based on the independent contractor's gross receipts, without deducting his "production costs." In that case, the independent contractor was injured while attempting to fell a tree. See id. at 348. The independent contractor, who was entitled to workers' compensation coverage, filed a claim for benefits. See id. The State Board of Workers'

- 24 -

Compensation determined that the independent contractor's AWW could not be "reasonably and fairly determined" based on the statutory method, and instead used the independent contractor's "full-time wage[,]" awarding compensation based on the independent contractor's gross receipts without deducting production costs. Id. On appeal, the employer contended that the independent contractor's production costs should have been deducted when calculating his AWW because the independent contractor was not an "employee." Id. The Court disagreed and upheld the Board's calculation, explaining:

> The Georgia Workers' Compensation Act is a humanitarian measure meant to provide relief to the injured employee, and the Act should be liberally interpreted by the courts to carry out that purpose. In light of that purpose and given the circumstances of the instant case, we cannot countenance an interpretation of the Act which will result in a reduction of benefits to recipients.

Id. at 348-49 (citation omitted).

The Court also addressed the employer's argument that, as used in the Georgia Workers' Compensation Act, the terms "fees" and "wages" were distinct, with "fees being the gross amounts [the employer] paid [the independent contractor], and wages being the net amounts [the independent contractor] retained for himself after expenses." Id. at 349. As to that point, the Court explained:

> The Act does not specifically define either term, leaving us to apply ordinary meanings in everyday usage. Webster's 7th New Collegiate Dictionary defines "wage" as "a payment, usually of money for labor or services usually according to contract and on an hourly, daily, or piecework basis . . . especially for physical labor." "Fee" is offered as a synonym; it "applies to the price asked or paid for services of a physician, lawyer, artist or other professional." Clearly, it is not mandated by definition or otherwise that one make any deductions before calculating the [independent contractor]'s wages, particularly in view of the fact that [the employer] deducted the workers' compensation premiums from his gross, rather than net, receipts. It

- 25 -

> appearing that [the employer] made an election, this court will not rescue it from its decision.

Id. (ellipsis in original).

By contrast, other jurisdictions have held that net profit is the best figure to use for calculating a self-employed individual's AWW. In Stephen v. Avins Constr. Co., 478 S.E.2d 74, 75 (S.C. Ct. App. 1996), the Court of Appeals of South Carolina held that the South Carolina Workers' Compensation Commission was correct in computing a subcontractor's AWW based on net, as opposed to gross, earnings. In that case, the subcontractor sustained an injury during the course of his employment as a subcontractor for a construction company. See id. The subcontractor received compensation, and sometime afterward, the construction company sought permission to discontinue compensation payments on the ground that the subcontractor had reached maximum medical improvement. See id. At a hearing, the subcontractor testified that he employed as many as four people, and the construction company paid the subcontractor per job and deducted workers' compensation premiums before paying the subcontractor for his labor. See id. The subcontractor admitted that the money that was paid to him reflected all the money paid to his business, including what he paid other employees. See id. As the workers' compensation commissioner found, the money that was paid to the subcontractor was for an entire job, and did not solely reflect the subcontractor's earnings, and, the money that was paid to the subcontractor included the costs of materials, wages that were paid to other employees, and other expenses. See id. Accordingly, the commissioner granted the construction company's motion to discontinue payment of compensation, and held that the

subcontractor's AWW "should be based upon his tax returns as a self-employed subcontractor[.]" Id. The subcontractor appealed, contending that his AWW should have been based on his gross income, not his net profit, and arguing that the construction company had paid insurance premiums that were based on the subcontractor's gross income. See id. at 75, 76.

The Court affirmed the commissioner's calculation of the subcontractor's AWW, holding that there was "substantial evidence in the record to support a finding that [the subcontractor]'s [AWW] and compensation rate should be based upon his net earnings, [the subcontractor]'s gross earnings having included wages paid to other employees and various business deductions." Id. at 81. The Court began its analysis by looking to the South Carolina Workers' Compensation Act, which defined AWW as "the earnings of the injured employee in the employment in which he was working at the time of the injury during the period of fifty-two weeks immediately preceding the date of the injury[,]" and did not "specify whether 'wages' refers to net or gross earnings of a business owner operating as a subcontractor." Id. at 76. Because the Supreme Court of South Carolina had not addressed the calculation of a subcontractor's AWW, and because the statute did not address the matter, the Court looked to other jurisdictions for guidance, including Fitzgerald, 322 S.E.2d 347. See Stephen, 478 S.E.2d at 78-80. The Court explained that there are "[d]ifficulties [] inherent in using gross pay for the purpose of determining the 'earnings of the injured employee[,]'" stating:

> A plethora of business expenses may be encapsulated within the gross pay
> received. Examples of expenses not included in computing the earnings of a
> covered person are automobile allowances; mileage expenses; equipment

- 27 -

rentals; labor, fuel, repair bills, and insurance; and depreciation of business equipment, interest on business debts, and the purchase price of a saw[.]

Id. at 80 (citations omitted). The Court then noted that the subcontractor had deducted numerous business expenses on his income tax form, including car and truck expenses, travel, meals and entertainment, and wages. See id.

The Court rejected the subcontractor's contention that his AWW had to be based on gross pay because that figure was the basis of the insurance premiums, reasoning:

> The quiddity of [the subcontractor]'s contention to support a calculation based on gross pay is the deduction of Workers' Compensation premiums from his gross pay by [the construction company]. Facially, this would seem to justify the use of gross pay rather than net pay. However, we reject this argument and hold that reimbursements received by [the subcontractor] cannot be the basis for a computation of his "earnings." The [c]ommission[er] was correct in calculating the "earnings" of [the subcontractor] by using [the subcontractor]'s [AWW] of $272.09, based upon his tax returns as a self-employed contractor, resulting in a compensation rate of $181.39. [The subcontractor]'s gross receipts totaled $37,070.00. His net profits totaled $14,150.00. [The subcontractor]'s net profit, $14,150.00, divided by 52 (number of weeks in a year) totals $272.09. Two-thirds of $272.09 equals $181.39.

Id. at 81 (brackets, ellipsis, and some internal quotation marks omitted). The Court ultimately concluded:

> We hold that a subcontractor's compensation rate should be determined based on his net taxable income even though the subcontractor was charged Workers' Compensation premiums based on his gross earnings. In our view, the statutory language, "earnings of the injured employee," means the actual sum paid to the employee as his wages, not the totality of the payments including reimbursements. Reimbursements do not equate with the statutory language of "earnings." Accordingly, we affirm the ruling of the Workers' Compensation Commission that [the subcontractor]'s [AWW] should be computed based on his net, as opposed to his gross, earnings.

Id.

Similarly, in In re Carnahan, 821 A.2d 1122, 1123-24 (N.H. 2003), the Supreme Court of New Hampshire affirmed a compensation award in which a self-employed cross-country truck driver's AWW was based on net profit, not gross income. In that case, the driver worked as an independent contractor, was injured, and began receiving benefits. See id. at 1123. The driver requested a hearing, contesting the insurer's calculation of his disability benefits. See id. At the hearing, the driver produced tax returns showing gross receipts that totaled $129,729 and business deductions that totaled $102,184 in expenses for motels, uniforms, laundry service, meals and entertainment, and depreciation of his truck. See id. at 1123-24. Based on the tax return, the hearing officer calculated the driver's AWW by dividing his net profit of $27,545 by the thirty-eight weeks that he had worked that year. See id. at 1124. The driver appealed, contending, in pertinent part, that his AWW should have been calculated based on his gross income and not his net profit. See id.

As to that argument, the Court observed that the workers' compensation act provided that AWW was to be computed "by dividing 'gross earnings' over a period of 26 to 52 weeks (in order to yield a result most favorable to the employee) by that number of weeks." Id. The statute, however, did not define "gross earnings," and the driver contended that "gross earnings" was synonymous with "gross income." Id. The Court rejected that argument, explaining:

> This construction, however, produces an absurd result. An independent contractor with a gross income of $200,000 who incurs $150,000 in business expenses would have "gross earnings" of $200,000. At the same time, an employee who does the same work, receiving a salary of $50,000, while his employer covers business expenses of $150,000, would have only $50,000

in "gross earnings." Nothing in the statute suggests that self-employed contractors should be entitled to such a windfall.

Id. Instead, the Court stated that, because the driver had "produced no evidence, other than his tax returns, that would suggest an alternate method of calculating his income, [the Court] agree[d] that the board was correct to use his net profit of approximately $27,545 as his 'gross earnings.'" Id. The Court also disagreed that the statutory definition of wages required that certain expenses be included in the calculation of the driver's AWW. See id. at 1125. The Court stated: "[A]llowing a self-employed contractor to include his business expenditures as 'wages' would lead to the same absurd windfall inherent in [the driver]'s suggested definition of 'gross earnings,' as a salaried employee cannot include employer-reimbursed business expenses as 'wages.'" Id. (citation omitted).

Likewise, in Vite v. Vite, 377 S.W.3d 453, 455, 459 (Ark. Ct. App. 2010), the Court of Appeals of Arkansas held that the workers' compensation commission was correct in calculating a self-employed sole proprietor's AWW based on his net profit (taking into account deductions for business expenses) instead of his gross receipts. In that case, the sole proprietor was a carpet layer who injured his back during the course of his employment. See id. at 455. At a hearing, the sole proprietor argued that his AWW "should be calculated upon gross earnings without consideration of business deductions[.]" See id. The Commission rejected that approach and instead relied on Schedule C in the sole proprietor's income tax returns, in which the gross receipts totaled $292,734, the expenses and depreciation totaled $265,695, and the net profit was $27,039. See id. at 457-58. Using those figures, the Commission determined that the sole proprietor's AWW was

$587.30 by dividing the net profit of $27,039 by forty-six, the number of weeks that the sole proprietor had worked the year prior to his injury. See id. at 458.

On appeal, the sole proprietor contended "that the Commission erred in deducting from his gross wages three business expenses: $16,560 for car and truck expenses, $8,202 for insurance, and $1,270 for legal and professional services." Id. The sole proprietor also argued that, after deducting for contract labor, he earned over $93,000. See id. The sole proprietorship and the insurers responded that using net profit rather than gross earnings to calculate the sole proprietor's AWW was "[e]minently reasonable for ascertaining a self-employed claimant's weekly wage because it provides a close estimate of average wage or take-home pay." Id. In addressing the issue, the Court first looked to a prior case in which the commission addressed "what portion of business expenses, if any, should be deducted from a sole proprietorship's gross income in calculating" AWW. Id. at 457. The Commission concluded:

> Although the claimant insists that no expenses should be deducted, other states have held that a sole proprietorship's net earnings should be used as the basis for determining a claimant's wages because inclusion of unreimbursed business expenses does not accurately reflect a claimant's actual earnings during the period. Net earnings represent the difference between gross income and necessary business operating expenses.

Id. (citations omitted). The Court also set forth the relevant provisions of the Arkansas Workers' Compensation Act, which provided that "[c]ompensation shall be computed on the [AWW] earned by the employee under the contract of hire in force at the time of the accident and in no case shall be computed on less than a full-time workweek in the employment." Id. at 458 (citation omitted). The act provided that "[i]f, because of

exceptional circumstances, the [AWW] cannot be fairly and justly determined by the above formulas, the commission may determine the [AWW] by a method that is just and fair to all parties concerned." Id. (citation and emphasis omitted). Moreover, the Arkansas Workers' Compensation Act provided that "workers' compensation statutes [] must be strictly construed, allowing nothing to be taken as intended unless clearly expressed." Id. at 459 (citations omitted).

In accordance with the statutes and case law, the Court concluded:

[T]he Commission's decision to deduct the business expenses [the sole proprietor] claimed from his gross receipts, as set forth in his 2007 federal tax return, constituted a determination of [AWW] that was 'just and fair to all parties,' as allowed by [statute]. The Commission's interpretation of the statute was correct, and we affirm its decision to deduct all claimed business expenses from gross earnings in the present case.

Id.

Similarly, in Meredith Constr. Co. v. Holcombe, 466 S.E.2d 108, 109-10 (Va. Ct. App. 1996), the Court of Appeals of Virginia affirmed the workers' compensation commission's award, in which the commission calculated a self-employed sole proprietor's AWW "based upon the net taxable income, including depreciation, reported [by the sole proprietor]'s business[,]" and stated that, "[w]hen the earnings of an injured employee are not amenable to the primary calculation specified in [the statute], the commission properly resorts to such other method of computing [AWW] most nearly approximating the amount which the injured employee earns." (Citations, brackets, ellipses, and internal quotation marks omitted).

Still other jurisdictions have held that, under circumstances in which net profit is

not an appropriate measure of an individual's earnings, a different method of calculating AWW is proper. For example, in Mail Boxes, 888 P.2d at 778, the Supreme Court of Arizona was "asked to define the term 'actual average monthly wage' as it appears in [the workers' compensation act] for purposes of calculating a sole proprietor's permanent disability benefits[,]" and held "that a sole proprietor's 'wage' is measured by the market value of his or her services to the business[.]" In that case, the sole proprietor had workers' compensation coverage and was assessed an insurance premium on an estimated average monthly wage of $1,650. See id. During the course of his employment, the sole proprietor was injured and filed a workers' compensation claim. See id. The sole proprietor's average monthly wage was set at $1,650 for purposes of temporary benefits, but the State Compensation Fund subsequently determined that the sole proprietor had earned no wages in the year that he was injured, recalculated the average monthly wage as $0, and denied all permanent disability benefits. See id. The sole proprietor requested a hearing, and an administrative law judge reinstated the previous award based on an average monthly wage of $1,650, finding

> that even though the business did not show a profit in 1989, losses would have increased by approximately $1,733.32 per month if [the sole proprietor] had operated only as an owner or investor in the business. Because $1,733.32 was greater than the assumed average monthly wage of $1,650, he chose the lesser of the two figures, as required by [statute.]

Id. at 778-79 (footnote omitted).

The Arizona Workers' Compensation Act provided that "compensation for a sole proprietor's permanent disability is the lesser of the 'actual average monthly wage' or the agreed upon 'assumed monthly wage.'" Id. at 779 (citation and footnote omitted). The

- 33 -

Court examined the term "actual average monthly wage," and explained:

> Wages and earned income are different accounting terms. The underlying purpose of the Workers' Compensation Act . . . is to compensate an employee for lost earning capacity and to prevent the injured employee and dependents from becoming public charges during the period of disability. With that purpose in mind, a sole proprietor's "wage" cannot mean the business's "earned income." Applying the "earned income" definition in this case would mean the employee paid his premiums for no coverage—a result contrary to the intent of the Act, which is to provide coverage to premium-paying sole proprietors.

Id. at 779-80 (citation omitted). The Court then noted the important public policy considerations that dictated its holding, reasoning:

> We do not believe that the legislature intended to condition a sole proprietor's compensation on the success of the business. It is common knowledge, and even the Fund's accountant agreed, that often a business will not show a profit during the first year or few years of operation. It would be a great windfall to the carrier to be allowed to collect premiums during these years but deny benefits. Applying the "earned income" definition also leads to untoward results. For example, if both a sole proprietor and his employee are injured on the first day of business, the employee could receive permanent disability benefits but the sole proprietor could not. And what of the sole proprietor who earns a profit one year and not the next? Whether benefits are paid would depend on whether the insured is fortuitous enough to be injured during a profitable year. But the value of his services to the business do not change. The labor performed is the same, whether it results in profit or reduced losses.

Id. at 780. Accordingly, the Court held that "[t]he best way to measure the lost earning capacity of a sole proprietor is by the market value of the services performed." Id. at 780-81.

In McAnelly v. Wilson Pallet and Crate Co., 460 S.E.2d 894, 899 (N.C. Ct. App. 1995), the Court of Appeals of North Carolina held that the workers' compensation commission erred in determining a sole proprietor's AWW based on net profit instead of

- 34 -

the sole proprietor's earnings. After the sole proprietor was injured during the course of his employment, a deputy commissioner determined that the sole proprietor's AWW was $573.07, with compensation at a rate of $376 per week. See id. at 895. Subsequently, because the sole proprietorship did not have any net profit the year preceding the sole proprietor's injury, the full commission adjusted the award from compensation of $376 per week to the minimum rate of $30 per week. See id. Upon review, the Court reversed the full commission's decision and reinstated the deputy commissioner's award, explaining:

> In this case the Deputy Commissioner found that . . . [the sole proprietor] was earning an [AWW] of $573.07. . . . We find in the record competent evidence to support the Deputy Commissioner's finding, including [the sole proprietorship]'s federal and state quarterly wage reports indicating wages paid to [the sole proprietor], the [sole proprietorship]'s payroll record showing [the sole proprietor]'s wages, and copies of checks written on the [sole proprietorship]'s account to [the sole proprietor] and his landlord for the period January 1989 through November 1989. The Full Commission made no finding of fact as to [AWW], and instead, replaced the Deputy Commissioner's finding with "the . . . sole proprietor[] did not earn a net profit during the 52 weeks preceding his injury." Based on that finding, the Full Commission modified the award to a payment at the minimum rate of $30.00 per week.

> . . . We find nothing in the statute defining [AWW] nor in the cases interpreting that statute which warrants a conclusion that [the sole proprietor] is entitled to payment at a minimum rate of $30.00 per week based on a finding that his business failed to show a net profit for the fifty-two weeks preceding his injury. Under [the statute], [AWW] must be related to an employee's earnings, not to his earning capacity. The profit or loss of a business may not necessarily reflect the value of the plaintiff's services to it. Moreover, [the sole proprietor] lawfully elected to be treated as any other employee of [the sole proprietorship] under the sole proprietor provision of the statute. The Commission would not base their award for any other employee on whether or not the employer showed a profit, rather than on the wages paid to the employee.

Id. at 898-99 (brackets and some internal quotation marks omitted).

And, in Thompson v. Harold Thompson Trucking, 748 P.2d 430, 438 (Kan. Ct. App. 1987), the Court of Appeals of Kansas held that "owner withdrawal" figures were properly used to determine a sole proprietor's AWW. The sole proprietor, who employed three individuals, was fatally injured as a result of an accident that occurred during the course of his employment. See id. at 432. An administrative law judge determined the sole proprietor's AWW for the twenty-six weeks preceding the accident to be $216.39. See id. at 437. The evidence demonstrated that, although the sole proprietor did not receive a fixed salary, the sole proprietorship's account was used to pay his personal expenses. See id. The sole proprietor's widow testified that she wrote checks on the sole proprietorship's account for her and the sole proprietor's personal expenses; the amounts of the checks, for items such as food, clothing, and insurance, were recorded in the sole proprietorship's ledger as "owner withdrawal." See id. None of the checks was made directly payable to the sole proprietor or his widow, although they benefited from the withdrawals. See id. No other evidence of income was presented. See id. In the twenty-six weeks preceding the accident, the sole proprietor was paid $5,626.05 in owner withdrawals for personal expenses, which the administrative law judge divided by twenty-six to calculate an AWW of $216.39. See id. Upon review, the Court noted that, "[g]enerally, profits from a business, whether commercial or farm, are not considered wages for purposes of establishing average wage." Id. at 438. The Court then held:

> Since many wage earners support their families (paying for their food, clothing, and home and car insurance) from their [AWW], the "owner withdrawals" from [the sole proprietorship] account which were used as wages could reasonably be the basis for [the sole proprietor]'s salary. We conclude [that] the . . . finding that [the sole proprietor]'s [AWW] was

- 36 -

$216.39 is supported by substantial competent evidence.

Id.

**Analysis**

Here, we hold that the AWW of a sole proprietor who elects coverage under the Act is to be calculated based on the sole proprietorship's net profit, not on the sole proprietorship's gross income or gross receipts. We conclude that the sole proprietorship's net profit is the best approximation of the earnings that a sole proprietor actually takes home because net profit does not include the sole proprietorship's business costs and expenses. We begin by examining generally how a covered employee's AWW is calculated. As discussed above, generally, a covered employee's AWW is calculated based on LE § 9-602(a) and COMAR 14.09.03.06. COMAR 14.09.03.06A directs the Commission to determine a covered employee's AWW "from gross wages, including overtime[.]" Significantly, neither the Act nor COMAR defines the term "gross wages," and neither specifies whether, in the case of a sole proprietor, "gross wages" refers to the sole proprietorship's gross receipts, net profit, or some other figure.

We disagree with Long that the term "gross wages" is synonymous with "gross receipts" or "gross income." Under the Act, for purposes of calculating AWW, "wages shall include: (i) tips; and (ii) the reasonable value of housing, lodging, meals, rent, and other similar advantages that the covered employee received from the employer." LE § 9-602(a)(2) (paragraph breaks omitted). And, Black's Law Dictionary defines "wage" as

> [p]ayment for labor or services, usu[ally] based on time worked or quantity
> produced; specif[ically], compensation of an employee based on time
> worked or output of production. Wages include every form of remuneration

> payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer.

Wage, Black's Law Dictionary 1811 (10th ed. 2014). In other words, the plain meaning of the term "wages" is compensation or payment in almost any form for an individual's labor or services. And, as understood in everyday parlance, "wages" are earned by an individual after performing work; *i.e.*, individuals, not business entities, earn wages. Moreover, under the plain language of the Act and COMAR, it is evident that "gross wages" and "wages" refer to an individual's earnings. Indeed, under COMAR 14.09.03.06A, AWW is calculated "from gross wages, including overtime[.]" Common sense dictates that only an individual, and not a business entity, can earn overtime. Similarly, pursuant to LE § 9-602(a)(2)(ii), "wages shall include: . . . the reasonable value of housing, lodging, meals, rent, and other similar advantages **that the covered employee received from the employer**." (Emphasis added). Stated otherwise, from the plain language of the Act and COMAR 14.09.03.06, as well as the plain and commonsense meaning of the terms, we conclude that "gross wages" and "wages," in the context of calculating AWW, refer to an individual's earnings, and not a business entity's earnings, even if that business entity is a sole proprietorship. Indeed, the relevant provisions of the Act and COMAR 14.09.03.06 specifically reference the "covered employee" or "claimant," not a covered employee's or claimant's business.

By contrast, "gross income" or "gross receipts" more broadly encompass a business entity's earnings. For example, Black's Law Dictionary defines "gross receipts" as "[t]he

- 38 -

total amount of money or other consideration received by a business taxpayer for goods sold or services performed in a taxable year, before deductions." Gross Receipts, Black's Law Dictionary 819 (10th ed. 2014). Similarly, "gross income" is defined as "[t]otal income from all sources before deductions, exemptions, or other tax reductions." Gross Income, Black's Law Dictionary 881 (10th ed. 2014). Thus, "gross income" and "gross receipts" are broader terms that may include not only an individual's earnings, but also a business entity's earnings. It does not follow, however, that "gross wages" is synonymous with "gross income" and "gross receipts," especially in light of the circumstance that "gross wages" is a narrower term that is aimed at capturing an individual's earnings, and does not refer to anything that is related to a business entity's earnings, as, unlike an individual, a business entity cannot earn overtime or have lodging or meals in the ordinary sense.

Further still, "gross income" and "gross receipts" are distinct from "net profit." As just mentioned, "gross income" and "gross receipts" are figures that do not take into account any deductions. Thus, a business entity's "gross income" or "gross receipts" includes the business's costs and expenses. By contrast, "net profit" is "[t]otal sales revenue less the cost of the goods sold and all additional expenses." Net Profit, Black's Law Dictionary 1404 (10th ed. 2014). As demonstrated by Long's 2011 Schedule C, in this case, the Employer's net profit was calculated by subtracting the total business expenses from the Employer's gross income. Thus, net profit does not include a business's costs and expenses that often have little or nothing to do with an employee, such as advertising, depreciation, vehicle rentals, supplies, and utilities.

Significantly, in this case, as a self-employed sole proprietor, Long did not earn

"wages," and instead claimed only business income on his 2011 federal individual income tax return. Similarly, the 2011 Schedule C did not include any business expense for "wages." Having not earned wages, and thus lacking any gross wages, the standard AWW calculation that is contemplated by the Act and COMAR 14.09.03.06 simply cannot be used in Long's case. It is undisputed that Long did not earn wages from the Employer. Moreover, as a sole proprietor, Long would not have received vacation wages or been involuntarily laid off by the Employer, as set forth in COMAR 14.09.03.06B. Accordingly, in this situation, where a self-employed sole proprietor seeks workers' compensation benefits, the Commission is not bound by an initial award calculation; instead, the Commission "can determine an accurate [AWW] at the first hearing" based on evidence that is presented by the parties. COMAR 14.09.03.06C(2); cf. Gross, 331 Md. at 50, 626 A.2d at 62 (This Court held that the Commission could depart from the time period that is set forth in COMAR 14.09.01.05 for purposes of calculating AWW where there is a hearing and where it was appropriate to deviate.).

Thus, the task in the case of a self-employed sole proprietor who does not earn wages is to determine what measure best approximates the sole proprietor's "gross wages." In our view, a sole proprietorship's net profit is the best approximation of the earnings that a sole proprietor actually takes home because, unlike the sole proprietorship's gross income or gross receipts, net profit does not include the sole proprietorship's business costs and expenses. Our holding is consistent with a number of cases from other jurisdictions that have determined that a self-employed individual's AWW is to be calculated based on net profit. See Vite, 377 S.W.3d at 459 ("[T]he Commission's decision to deduct the business

- 40 -

expenses [the sole proprietor] claimed from his gross receipts, as set forth in his 2007 federal tax return, constituted a determination of [AWW] that was 'just and fair to all parties,' as allowed by [statute]."); Carnahan, 821 A.2d at 1124 (Because the driver had "produced no evidence, other than his tax returns, that would suggest an alternate method of calculating his income, [the Court] agree[d] that the board was correct to use his net profit . . . as his 'gross earnings.'"); Stephen, 478 S.E.2d at 81 ("[S]ubstantial evidence in the record [] support[ed] a finding that [the subcontractor]'s [AWW] and compensation rate should be based upon his net earnings, [the subcontractor]'s gross earnings having included wages paid to other employees and various business deductions."); Meredith, 466 S.E.2d at 109-10 (The Court affirmed the calculation of a self-employed sole proprietor's AWW based on net taxable income that was reported by the sole proprietorship, and stated that, "[w]hen the earnings of an injured employee are not amenable to the primary calculation specified in [the statute], the commission properly resorts to such other method of computing [AWW] most nearly approximating the amount which the injured employee earns."  (Citations, brackets, ellipses, and internal quotation marks omitted)).

In this case, Long determined his self-employment tax liability for the 2011 tax year by using the Employer's net profit of $16,879; and, on his 2011 federal income tax return, Long claimed income consisting of the Employer's net profit of $16,879 and a taxable refund or credit of $369.  In other words, by his own admission, Long's take-home earnings in the year of his injury were $16,879, not the Employer's gross income of $44,606.  Using the Employer's net profit—which Long himself identified as his income and used for purposes of determining his self-employment tax liability—as the basis for the calculation

of Long's AWW is reasonable and logical under the circumstances of this case. As the Supreme Court of New Hampshire explained in Carnahan, 821 A.2d at 1124, equating "gross earnings" (or, in this case, "gross wages") with "gross income" would lead to an absurd result in the case of a self-employed individual:

> An independent contractor with a gross income of $200,000 who incurs $150,000 in business expenses would have "gross earnings" of $200,000. At the same time, an employee who does the same work, receiving a salary of $50,000, while his employer covers business expenses of $150,000, would have only $50,000 in "gross earnings." Nothing in the statute suggests that self-employed contractors should be entitled to such a windfall.

Moreover, as the Court of Appeals of South Carolina recognized in Stephen, 478 S.E.2d at 80:

> Difficulties are inherent in using gross pay for the purpose of determining the "earnings of the injured employee." A plethora of business expenses may be encapsulated within the gross pay received. Examples of expenses not included in computing the earnings of a covered person are automobile allowances; mileage expenses; equipment rentals; labor, fuel, repair bills, and insurance; and depreciation of business equipment, interest on business debts, and the purchase price of a saw[.]

(Citations omitted).

The analysis of these jurisdictions persuades us that calculating a sole proprietor's AWW based on the sole proprietorship's net profit is appropriate. Indeed, in this case, to hold otherwise—that Long's AWW should be based on the Employer's gross receipts— would lead to a slippery slope and result in the problem that we so carefully sought to avoid in Stevenson, 171 Md. at 577, 189 A. at 913—namely, that "[c]onceivably[,] work[ers who are] injured might be entitled to receive much more by reason of their injuries than they could possibly earn at work." Ultimately, using a sole proprietorship's net profit instead

of its gross income or gross receipts avoids the pitfall of a possible windfall to the sole proprietor whereby the sole proprietor would receive more compensation by being injured than by working. Additionally, we observe that the Act's purpose is to "protect[] employees, employers, and the public alike" by "provid[ing] employees suffering from work-related accidental injuries, regardless of fault, with a certain, efficient, and dignified form of compensation[, and i]n exchange, employees abandon common law remedies, thereby relieving employers from the vagaries of tort liability." Polomski v. Mayor & City Council of Balt., 344 Md. 70, 76-77, 684 A.2d 1338, 1341 (1996) (citations and footnote omitted). However, as evidenced by LE § 9-637(a)(1), compensation to a covered employee for permanent total disability for an accidental personal injury is to equal two-thirds of the AWW, not the full AWW. In other words, as demonstrated by the two-thirds formula, although the purpose of workers' compensation is to protect an employee and provide the employee with compensation, such compensation is not intended to exceed, or even match, what the employee earns on a weekly basis.

We are unpersuaded by Long's reliance on Fitzgerald, 322 S.E.2d 347, for the contention that his AWW should be based on the Employer's gross receipts. In Fitzgerald, id. at 348, the Board calculated the independent contractor's AWW based on his "full-time wage[,]" awarding compensation at a rate of $135 per week based on the independent contractor's gross receipts without deducting "production costs." The Court of Appeals of Georgia affirmed the award and rejected the employer's contention that there was a difference between the terms "fees" and "wages" for purposes of the workers' compensation act, simply stating: "[I]t is not mandated by definition or otherwise that one

- 43 -

make any deductions before calculating the [independent contractor]'s wages, particularly in view of the fact that [the employer] deducted the workers' compensation premiums from his gross, rather than net, receipts." Id. at 349. Significantly, Fitzgerald had an uncomplicated fact pattern involving a very low amount of compensation, and the opinion consists of only four paragraphs. Indeed, the sole issue in the case was whether the independent contractor's "production costs" should have been deducted from his wages before calculating his AWW. See id. at 348. Interestingly, at no point did the Court identify the amount of the independent contractor's wages or production costs. And the Court's sole rationale for affirming the Board's award appears to be that the employer paid insurance premiums that were based on the independent contractor's gross receipts. See id. at 349. In this case, however, Long seeks to have numerous costs and expenses included in the calculation of his AWW—costs and expenses totaling $27,727, as reflected in the 2011 Schedule C, which comprises approximately 62% of the Employer's gross income of $44,606. Under these circumstances, Fitzgerald provides little guidance or support.

Instead, we conclude that the reasoning of the Court of Appeals of South Carolina in Stephen, 478 S.E.2d 74, is more persuasive. In Stephen, id. at 81, the Court affirmed the calculation of the subcontractor's AWW and compensation rate based on his net earnings, not his gross earnings, because the subcontractor's gross earnings included wages that were paid to other employees and various other business expenses that were deducted from the subcontractor's taxable income. The Court thoroughly explained the problems that arise in using gross receipts for determining AWW, namely, that gross receipts include "[a] plethora of business expenses[.]" Id. at 80. The Court rejected the subcontractor's

contention that his AWW should be based on his gross receipts because that was the figure that was used by the construction company for insurance premiums. See id. at 81. Specifically, the Court held that "reimbursements received by [the subcontractor could ]not be the basis for a computation of his 'earnings[,]'" because the statutory language of "earnings of the injured employee" meant "the actual sum paid to the employee as his wages, not the totality of payments including reimbursements." Id. In our view, this approach is the correct one because it relies on a self-employed individual's pre-injury net profit, as reported on his or her taxes, and avoids a windfall to the self-employed individual that can result if business expenses are not deducted and not factored into the calculation of AWW.

That other jurisdictions have used figures other than a self-employed individual's net profit in calculating AWW is of no consequence because those cases are distinguishable in that either the self-employed individual had no net profit, or the self-employed individual presented an appropriate alternative income basis on which to base AWW. See, e.g., Mail Boxes, 888 P.2d at 778, 780-81 (Because the sole proprietor had earned no wages in the year that he was injured and was not paid wages, under the provisions of the Arizona Workers' Compensation Act, the Court held that "[t]he best way to measure the lost earning capacity of a sole proprietor is by the market value of the services performed."); McAnelly, 460 S.E.2d at 895, 898-99 (Although the sole proprietorship did not have any net profit the year preceding the sole proprietor's injury, because the sole proprietor was paid wages, as shown on the sole proprietorship's payroll record, those wages should have been the basis for calculating the sole proprietor's AWW.); Thompson, 748 P.2d at 437-38 (Because the

sole proprietor's widow had presented evidence that checks that were drawn on the sole proprietorship's account and recorded as "owner withdrawals" were used by the sole proprietor for personal expenses, and because no other evidence of income was presented, the Court concluded that the sole proprietor's AWW was properly calculated based on the amount of the "owner withdrawals" in the twenty-six weeks preceding the accident.). Simply stated, these cases are distinguishable from the instant case, where the Employer had a net profit the year in which Long was injured, and the evidence presented as to Long's wages included Long's tax returns and Schedule C, and did not include some other measure such as "owner withdrawals." Significantly, none of the courts in Mail Boxes, McAnelly, or Thompson stated that it would be inappropriate to use a self-employed individual's net profit as the basis for calculating AWW in other circumstances.[14]

We also reject Long's contention that his AWW should have been based on the Employer's gross receipts because IWIF based insurance premiums on the Employer's

---

[14]In holding that the Commission was correct in calculating Long's AWW based on the Employer's net profit, instead of gross receipts, we do not foreclose the possibility that a future case may require the Commission to determine a sole proprietor's AWW on some figure other than net profit, if appropriate and if evidence of some other figure is presented to the Commission. For example, as discussed above, a case may arise in which a sole proprietor operated at a loss prior to sustaining an accidental personal injury. See, e.g., Mail Boxes, 888 P.2d at 780-81. Under such a circumstance, where the sole proprietorship has a zero or negative net profit, the sole proprietor may present evidence of something other than net profit as an appropriate basis for calculating his or her AWW. However, because that is not the circumstance before this Court in this case and because the Commission was presented only with using either net profit or gross receipts in calculating Long's AWW—*i.e.,* Long did not propose some other alternative to net profit other than gross receipts—we leave that question for another day. The Commission should, however, be cautious in departing from the use of net profit in calculating a sole proprietor's AWW.

gross receipts, and we are unpersuaded that <u>Picanardi</u>, <u>Stevenson</u>, and <u>Crowner</u> compel the result that Long seeks.[15] As explained above, a sole proprietorship's gross receipts include business costs and expenses that should not be included in a calculation of AWW because such costs and expenses have little to do with the sole proprietor's labor and services and do not reflect what the sole proprietor takes home in actual wages. And, in any event, <u>Picanardi</u>, <u>Stevenson</u>, and <u>Crowner</u> are distinguishable from the instant case because none of the cases involved a sole proprietor or addressed, let alone mentioned, how to calculate a sole proprietor's AWW. Moreover, those cases do not stand for the general proposition that a sole proprietor's AWW must be based on the sole proprietorship's gross receipts instead of net profit.

It is evident that, in <u>Picanardi</u>, 135 Md. at 96, 108 A. at 484, our holding was based on our interpretation of the legislative intent of the provisions of the Act as they existed at that time. Specifically, in concluding that the clearly expressed legislative intent prohibited including board as wages where the value of the board was not fixed at the time of hiring, this Court concluded that "it would be unreasonable to hold that it was intended that the

---

[15]As an initial matter, as did the Court of Special Appeals, we note that the record in this case does not definitively demonstrate that IWIF based insurance premiums on the Employer's gross receipts. See <u>Long</u>, 225 Md. App. at 66-67, 123 A.3d at 573 ("We will assume, for purposes of this appeal, that [Long] is correct in regard to the basis for the premium in 2011, although the matter is not free from doubt." (Footnote omitted)). For example, in response to a Premium Audit Report for the policy that was effective from May 15, 2010 through May 15, 2011, in a pre-printed form dated May 23, 2011—only two months before Long's accident—Long stated that employee payroll was zero and that his "gross wages" were $11,077. At the February 12, 2014 hearing before the circuit court, Long's counsel claimed that Long "simply wrote the wrong number down." What effect, if any, the audit had on IWIF's calculations of Long's premiums is unknown. And, before this Court, IWIF disputes that it set premiums based on Long's actual gross wages/payroll.

premiums and rates of insurance from which the fund to pay losses were derived were to be calculated on a narrower basis than that adopted for the allowance of compensation." Id. at 96, 108 A. at 484. Stated otherwise, in Picanardi, we held that, because the General Assembly at that time did not permit insurance premiums to be based on the value of board where the value was not fixed at the time of hiring, the General Assembly did not intend insurers to pay compensation to employees based on the value of board. However, as explained in Pennel, 133 Md. App. at 295-96, 754 A.2d at 1129, the Act was amended after Picanardi, and subsequent case law had also led to the conclusion that the value of lodging and other advantages could be computed as wages by assigning such items a present cash value. In other words, the reasoning underlying our decision in Picanardi has been superseded by both statute and case law, and is not persuasive in this case. Additionally, we observe that nothing in Picanardi stands for the broad, general proposition that an employee's AWW must always be based on the same figure from which workers' compensation insurance premiums are calculated.

To be sure, in Picanardi, 135 Md. at 96, 108 A. at 484, Stevenson, 171 Md. at 576-77, 189 A. at 912-13, and Crowner, 226 Md. at 612-13, 175 A.2d at 10, this Court noted the correlation between the actual wages that are paid to the employee and the insurance premiums that are charged by the insurer to the employer. Those cases, however, do not hold that insurance premiums dictate calculation of an employee's AWW. In any event, as we explained above, adopting the position that a sole proprietor's AWW should be based on a sole proprietorship's gross receipts because insurance premiums are based on gross receipts would result in an injured sole proprietor's being able to recover an AWW that is

greater than the sole proprietor's AWW when he or she is working. In other words, the sole proprietor would receive a windfall by virtue of being injured. We decline to adopt such a general rule that would, in effect, permit a sole proprietor to receive a windfall for being injured.

Our workers' compensation jurisprudence and our liberal construction of the Act do not compel a different result. For example, we have stated that, as to cases involving the Act, "we [] endeavor to interpret its provisions liberally, where possible, in order to effectuate the broad remedial purpose of the statutory scheme." W.M. Schlosser, 414 Md. at 204, 994 A.2d at 961 (citation omitted). And, in Breitenbach v. N.B. Handy Co., 366 Md. 467, 473, 784 A.2d 569, 572-73 (2001), we stated that, "applying a canon of construction specific to the Act, if the intent of the [General Assembly] is ambiguous or remains unclear, we resolve any uncertainty in favor of the claimant." (Citations omitted). We also noted, however, that in liberally construing the Act, "we seek to avoid an interpretation which would lead to an untenable or illogical outcome." Id. at 472, 784 A.2d at 572 (citation omitted). Here, in our view, there is no ambiguity—a sole proprietor's "gross wages" are the sole proprietorship's net profit, not gross receipts. To hold otherwise would produce the illogical and unreasonable outcome that would create a windfall for sole proprietors, who would be entitled to far greater workers' compensation benefits than employees who do the same work for the same earnings.

In sum, we hold that the AWW of a sole proprietor who elects coverage under the Act is to be calculated based on the sole proprietorship's net profit, not on the sole proprietorship's gross income. In this case, the Commission was correct in calculating

Long's AWW based on the Employer's net profit in 2011, the year in which Long sustained his injury. The 2011 Schedule C identified a net profit of $16,879, which was the sole proprietorship's gross income of $44,606 less total expenses of $27,727. The net profit was the amount that Long identified on his 2011 federal individual income tax return as business income, and was the amount that Long identified as net profit for purposes of self-employment tax liability. The Commission determined that, in 2011, Long worked from January 1, 2011 to August 19, 2011, a period of thirty-four weeks. Accordingly, Long's AWW was calculated by dividing the net profit of $16,879 by thirty-four, arriving at an AWW of $496.44. The evidence in the record supports this figure, and the calculation was correctly based on the Employer's net profit.[16]

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

---

[16]As a final point, we note that, at oral argument, Long's counsel apparently abandoned the position that Long's AWW should be $1,737.11, as the Commission had originally amended the award to state after Long's request. Instead, Long's counsel contended that the AWW should have been $1,311.94, which is the Employer's gross receipts of $44,606 divided by thirty-four (the number of weeks that Long worked in 2011). This figure greatly exceeds the $496.44 that the Commission calculated Long's AWW to be based on the Employer's net profit. In our view, the significant gap between the AWW of $486.44 and $1,311.94 demonstrates in a very plain way why using net profit to calculate a sole proprietor's AWW is desirable—Long would receive a windfall by having his AWW based on the Employer's gross receipts because he would receive compensation at a much higher weekly rate than what he was actually taking home while working.